IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WILLIAM HARVEY | : | CIVIL ACTION |
| Petitioner, | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JOSEPH TERRA, *et al.*, | : | NO. 23–4539 |
| Respondents. | : | |

**RESPONSE TO PETITION FOR WRIT OF HABEAS CORPUS**

## I.     INTRODUCTION

Before this Court is William Harvey's counseled amended petition for a writ of habeas corpus. ECF No. 28. Harvey is currently serving a Pennsylvania state sentence of twenty-two to fifty years' imprisonment for two counts of aggravated assault and other charges related to a September 2010 shooting. Because Harvey's claims are meritless and/or procedurally defaulted, his petition should be denied with prejudice and without a hearing.

## II.     FACTUAL AND PROCEDURAL HISTORY

On September 20, 2010, police responded to a shooting at 55th Street and Baltimore Avenue, and later found Donnell Wright and Darrell Thomas in nearby hospitals suffering from gunshot wounds. NT 2/12/2013 at 132–35, 147–48. Two days later, attorney Berto Elmore sent a letter to the Southwest Detective Division advising that his client Shakeema Scott, who

1

lived nearby the shooting scene, did not want to speak with the police without Elmore present. Elmore Letter Ex. 1. About a month later, police arrested Scott's live-in boyfriend, petitioner William Harvey. NT 2/13/2013 at 175–77.

At a municipal court appearance for Harvey, the prosecutor noted Elmore's letter, and Elmore withdrew as Harvey's counsel while promising to investigate whether potential conflicts would prevent him from representing Harvey. NT 11/16/2010 at 4–5, 11. The public defender represented Harvey at his preliminary hearing, but Elmore returned as Harvey's counsel months later and successfully argued a motion to quash attempted murder charges. NT 12/1/2010; NT 3/8/2011. At no point in the record did Elmore explain his potential conflicts.

The case proceeded to trial before the Honorable Charles Cunningham. The trial prosecutor was Nicole Siller. Elmore was trial counsel.

Darnell Thomas testified that he and other members of the Philly Street Kings Motorcycle Club met up with Scott outside her house to formally associate his club with hers. NT 2/12/2013 at 44–46. Conversely, Donnell Wright testified that he and other Philly Street Kings members had arrived that day to console Scott because she had had an argument. NT 2/13/2013 at 9. Wright had met Scott once before. *Id.* When Thomas approached Scott, a man who later identified himself as the father of Scott's child, interrupted and asked, "You called these [n-words] on me?" NT 2/12/2013 at 55. Thomas identified Harvey in court as the man who had interrupted. *Id.* at 54. Thomas introduced himself and explained he was just there for motorcycle club business, but when Harvey repeatedly asked, "Y'all got a problem?" Thomas responded, "You act like you want it to be a problem." *Id.* at 57. Wright gave an identical account of the meeting and also identified

Harvey in court. NT 2/13/2013 at 13, 15. After Thomas's remark, Harvey said, "I got you" and then asked a second man, "You got that thing?" Harvey and the second man walked toward a car where Harvey retrieved a gun and started firing from about twenty feet away. *Id.* at 14. Thomas was hit, and Wright dragged him into his van to escape. *Id.* at 16. As Wright was driving Thomas away, he saw a light-colored Buick pull up alongside with Harvey firing at them out the passenger window. *Id.* at 17, 102–03. Wright sensed that Harvey was trying to hit another member of the Philly Street Kings, Jeffrey Robinson, who was on the other side of the van, running away on foot. *Id.* at 16–17. One of the bullets struck Wright through the van door in the leg. *Id.* Eventually, the two vehicles parted ways and Wright and Thomas went to the hospital for treatment of their gunshot wounds. *Id.* at 28.

Police Officer Ronald Browne testified that in the hospital Thomas told him that he had visited Scott to "handle" a domestic situation for her and the shooter was her boyfriend. NT 2/12/2013 at 144. Police Officer Dennis Moore testified that Wright told him the shooter was Scott's boyfriend and he had worn a green hat. *Id.* at 148–49. Thomas and Wright later chose a photo of Brian Scott, Shakeema Scott's brother, out of a photo array, identifying him as the second man who had walked to the car with Harvey. NT 2/12/2013 at 122–23; NT 2/13/2013 at 33–36; NT 2/14/2013 at 49–51. They subsequently found a photo of the shooter on Shakeema Scott's Facebook page and showed that to police. NT 2/12/2013 at 93, 114; 2/13/2013 at 41–42, 110–11. Later, Thomas and Wright each identified Harvey as the shooter out of photo arrays. NT 2/12/2013 at 116–17; NT 2/13/2013 at 35.

When Scott was called as a Commonwealth witness at trial, Elmore asked for a sidebar where he disclosed he represented her. NT 2/13/2013 at

132.[1] Scott testified that at the time of the shooting she had one child with Harvey, her boyfriend who also went by "G," and she was eight-months pregnant with another of his. *Id.* at 135–40. Scott testified that Harvey and she were alone inside her house when Thomas and Wright rang her doorbell. *Id.* at 137–38. While Harvey was upstairs and Scott was speaking to the visitors, Scott testified, she heard gunshots. *Id.* Scott testified that she could not tell where the shots were coming from. *Id.* at 139. In the aftermath, Thomas and Wright ran to their vehicles, and Scott and Harvey ran down to collect her children from outside. *Id.* at 142–45. Scott testified that her brother Brian Scott was not nearby during the shooting. *Id.* at 149. Scott further testified that she did not tell a detective that her boyfriend had shot Thomas and Wright and did not speak to the detective until she was brought in for questioning. *Id.* at 149.

When the trial prosecutor asked Scott why she had hired Elmore after the shooting, Elmore objected on the grounds that it was "confidential information between me and my client." *Id.* at 150. The trial court sustained Elmore's objections and directed the prosecutor to refrain from asking Scott about her discussions with her lawyer. *Id.* at 150–51. Under cross examination by Elmore, Scott testified that there were many people out the night of the shooting including "T.J.," the father of her sister's child. *Id.* at 161. Scott testified that neither Harvey nor Brian Scott had a car, but T.J. had a gray car that was "like a Bonneville." *Id.* at 161–62.

---

[1] The sidebar was not recorded in the notes of testimony. NT 2/13/2013 at 132. However, in a subsequent discussion, the prosecutor said Elmore had disclosed at that sidebar that he "represented Ms. Scott." NT 2/14/2013 at 32–33.

Detective Joseph Murray, the assigned detective, testified that he spoke by phone with Shakeema Scott the night of the shooting, and before hanging up she told him that the shooter was her baby's father who went by "G." NT 2/14/2013 at 23–24. Detective Murray testified that he later verified the person on the phone had been Scott when he spoke to her in person. *Id.* at 24–25. However, Detective Murray acknowledged that in the statement she made after Harvey's arrest, Scott denied that she spoke with him the night of the shooting. *Id.* at 38, 115–16. Detective Murray testified that two days after the shooting he received a letter from Elmore advising that his client Scott did not "wish to make anymore statements" or "cooperate any longer" without her attorney present. *Id.* at 25–27, 34–35.[2] Detective Murray took statements from complainants Wright and Thomas who each identified the shooter as a boyfriend of Scott's. NT 2/14/2013 at 20–23. Wright and Thomas subsequently showed Detective Murray a photo from Facebook that they said depicted the shooter, but Detective Murray did not retain a copy of that photo. *Id.* at 40–42. Detective Murray subsequently learned who "G" was from another detective who had interviewed Scott's brother Preston Reeves in relation a different shooting. *Id.* at 6–8, 39–41. Soon thereafter, Detective Murray compiled a photo array, and Thomas and Wright separately identified Harvey's photo as the shooter. *Id.* at 45–48, 51–52. No weapon was recovered, no other eyewitnesses testified at trial, and no ballistics evidence was introduced at trial.

Before the close of evidence, Elmore asked that he be allowed to testify about why Scott hired him. NT *Id.* at 134. Judge Cunningham asked why

---

[2] Elmore's letter is attached as Ex. 1 – Elmore Letter.

Scott could not testify to that. *Id.* The next day, Elmore asked to call Scott to testify that she had not given the initial statement to police and to suggest she had been coerced. NT 2/15/2013 at 22. After the trial prosecutor noted that Scott had already testified that she did not speak to Detective Murray the night of the shooting, Judge Cunningham denied Elmore's request. *Id.* at 24–26. In her closing, the trial prosecutor argued that Scott had hired Elmore as her attorney to obstruct justice and noted that Scott and Harvey had the same attorney. *Id.* at 73–74, 80.

The jury made five requests to view photos and documents, and then returned a verdict after less than a day of deliberation. *Id.* at 140–149. Harvey was convicted of one count of aggravated assault each for shooting Wright and Thomas, conspiracy, carrying a firearm without a license, and possession of an instrument of crime. *Id.* at 149–50. The jury acquitted Harvey of aggravated assault against Robinson, the club member who had run away while Wright and Thomas escaped in a van. *Id.*

Judge Cunningham sentenced Harvey to twenty-two to fifty years' incarceration. NT 4/24/2013 at 44.[3] Harvey appealed, raising a claim that the Commonwealth had suppressed the above-mentioned Facebook photo in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). *Commonwealth v. Harvey*, No. 121 EDA 2014 at 4, 2016 WL 6090815, at *2 (Pa. Super. Ct. Oct. 18, 2016). The Superior Court affirmed. *Id.* at *4.

On May 9, 2017, Harvey filed a timely *pro se* petition under the Post-Conviction Relief Act, which the PCRA court dismissed as meritless.

---

[3] Brian Scott, the accomplice, subsequently entered a negotiated guilty plea to a murder-robbery that occurred in May 2010, and as part of that agreement the charges against him in this shooting were *nolle prossed*. *Commonwealth v. Scott*, Nos. CP-51-CR-0002136-2011, CP-51-CR-0002137-2011, CP-51-CR-0003001-2012 (Phila C.P.).

*Commonwealth v. Harvey*, 240 A.3d 184, 2020 WL 4883884, at *1 (Pa. Super. Ct. Aug. 20, 2020). Harvey appealed, arguing trial counsel was ineffective for failing to interview alibi witnesses. *Id.* at *2. The Superior Court affirmed, and the Supreme Court of Pennsylvania denied allowance of appeal on February 9, 2021. *Id.* at *5, *appeal den.*, 244 A. 3d 1226 (Pa. Feb. 9, 2021) (Table).

Harvey then filed a second *pro se* PCRA petition. *Commonwealth v. Harvey*, Nos. CP-51-CR-0014937-2010, CP-51-CR-0014981-2010, PCRA Pet (Phila C.P. May 26, 2021). While that petition was pending, Harvey filed a timely[4] *pro se* petition for writ of habeas corpus in federal court on June 17, 2021, arguing that trial counsel was ineffective for failing to investigate alibi witnesses, that the jury "should have been allowed to view" the Facebook photo that was suppressed in violation of *Brady*, and that trial counsel was ineffective because he represented multiple clients in the case. *Harvey v. Sorber*, No. 21-02896, ECF No. 2 at 8, 10, 16, 19 (E.D. Pa. Jun 24, 2021) (hereinafter *Sorber*). This Court then granted Harvey's motion to stay the federal proceedings pending final resolution of his then-pending PCRA

---

[4] The statute of limitations for federal habeas petitions begins to run when a judgment becomes final. 28 U.S.C. § 2244(d)(1)(A). Pennsylvania Rule of Appellate Procedure 1113(a) provides that appeals must be filed within 30 days of entry of the order of the Superior Court. Therefore, Harvey's judgment became final on November 17, 2016, which was 30 days after the Superior Court affirmed the judgment. The limitations period is tolled during the time when a "properly filed" application for post-conviction review is "pending." 28 U.S.C. § 2244(d)(2). Harvey properly filed a PCRA petition on May 9, 2017, meaning the limitations period had run for 173 days before it was tolled. The tolling ended on February 9, 2021, when the Supreme Court of Pennsylvania denied allowance of appeal. That left Harvey until August 20, 2021, to file a timely habeas petition. Harvey's petition two months before that deadline was timely.

case. *Sorber*, ECF No. 15. In state court, Judge Cunningham, sitting as the PCRA judge, granted Harvey's counseled amended petition on the grounds that Elmore was ineffective because he labored under an actual conflict of interest. NT 12/2/2021 at 14. One day later, Harvey wrote to this Court, explaining that his habeas petition should be withdrawn because he was granted a new trial in state court. *Sorber*, ECF No. 16. The Court dismissed Harvey's petition without prejudice and ordered it be marked closed. *Sorber*, ECF No. 17.

The Commonwealth appealed the state court grant of relief, and in a subsequent opinion, Judge Cunningham held that the PCRA claim was untimely, barring relief, but reasoned that if the Superior Court disagreed about the time-bar, it should grant Harvey a new trial because "trial counsel was ineffective by creating an actual conflict of interest." *Commonwealth v. Harvey*, Nos. CP-51-CR-0014937-2010, CP-51-CR-0014981-2010 at 4–10, 12 (Phila C.P. Apr 6, 2022). Per Judge Cunningham, Elmore had protected his client Scott from police questioning and in so doing had created "the impression" that he was "attempting to prevent a witness from testifying against [Harvey]." *Id.* Without addressing the merits, the Superior Court reversed the new-trial grant because the PCRA petition had been untimely and the Pennsylvania Supreme Court denied allowance of appeal. *Commonwealth v. Harvey*, 297 A.3d 713, 2023 WL 2885128 (Pa. Super. Ct. April 11, 2023), *appeal den.*, 304 A.3d 1026 (Pa. Sept. 25, 2023) (Table).

Harvey then filed the *pro se* petition initiating this case on November 7, 2023, raising the following grounds for relief:

1. Trial counsel was ineffective for failing to investigate alibi witnesses.

2. Harvey's due process rights under *Brady* were violated by the suppression of the Facebook photo Wright and Thomas had shown to police.

3. Trial counsel was ineffective because he labored under a conflict of interest.

ECF No. 1 at 8–11, 20.

Harvey subsequently filed a counseled amended petition, withdrawing his claim that trial counsel was ineffective for failing to investigate alibi witnesses. ECF No. 28 at 1 n.1. The amended petition raises the following grounds for relief:

1. Trial counsel was ineffective because he labored under a conflict of interest.

2. Trial counsel was ineffective for failing to obtain and make use of the Facebook photo.

3. Harvey's due process rights under *Brady* were violated by the suppression of impeachment evidence against Detective Murray.

ECF No. 28.

The petition is facially untimely, as Harvey acknowledges. For reasons of fairness and equity, because the reason for the untimeliness appears entirely attributable to Harvey's mistaken belief that withdrawing his timely petition was required when he was awarded a new trial in state court, ECF No. 28 at 31, Respondents elect to waive the statute of limitations defense as to Harvey's petition. *See Day v. McDonough*, 547 U.S. 198, 202 (2006).

9

### III.   DISCUSSION

All three of Harvey's proposed grounds for relief are procedurally defaulted, as they have not been litigated on the merits through one complete round of Pennsylvania's established appellate review process and the time to do so has expired, and otherwise without merit. *See* 28 U.S.C. § 2254(b)(1)(A); *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).[5] A claim may also be considered procedurally defaulted when a state court decides a petitioner's claim on adequate and independent state law ground. *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). Such a default generally bars a federal court sitting in habeas from reviewing the merits of the claims. However, Petitioners may overcome this bar if they can show good cause for the failure to raise the claims in state court and then that failure to reach the claims now will cause prejudice and/or result in a fundamental miscarriage of justice. *Id.* at 753.

In *Martinez v. Ryan*, 566 U.S. 1, 9 (2012), the Supreme Court established an equitable exception to *Coleman*'s general rule regarding cause and prejudice. Under *Martinez*, federal habeas courts may reach defaulted claims of ineffective assistance of trial counsel where the underlying claim is debatable, state collateral review was the first opportunity to raise the trial ineffectiveness claim, and collateral review counsel's failure to raise it fell below an objective standard of reasonableness. *Trevino v. Thaler*, 569 U.S. 413, 423 (2013). *Martinez* applies only to claims of trial counsel ineffectiveness and only if the default occurred during the initial PCRA

---

[5] Petitioners convicted in Pennsylvania need to fairly present their claims to the Superior Court but no higher. *Lambert v. Blackwell*, 387 F.3d 210, 233–34 (3d Cir. 2004).

10

stage as opposed to on appeal. *See Norris v. Brooks*, 794 F.3d 401, 405 (3d Cir. 2015).

## A. Harvey's Ground One is procedurally defaulted and/or without merit.

Harvey first argues that his Sixth Amendment right to effective counsel was violated. A petitioner claiming ineffective assistance of counsel must show that counsel's performance was so deficient that counsel was "not functioning as the 'counsel' guaranteed" by the Sixth Amendment. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). Counsel's performance is deficient when it falls "below an objective standard of reasonableness" and "outside the wide range of professionally competent assistance." *Id.* at 688, 690. A petitioner must also show that counsel's deficient performance prejudiced him, meaning there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is one "sufficient to undermine confidence in the outcome." *Id.*

In Ground One, Harvey claims trial counsel Elmore was ineffective because he labored under actual conflicts of interest that adversely affected his representation of Harvey. ECF No. 28 at 38–50. *See Cuyler v. Sullivan*, 446 U.S. 335 (1980).

Specifically, Harvey argues that Elmore concurrently represented Shakeema Scott because Elmore never formally terminated his representation of her, and Scott now says she believed that he had represented her at trial. *Id.* at 42–43. Harvey argues an actual conflict of interest existed because Elmore "possessed confidential information about Shakeema Scott that implicated Harvey's case," the subject matters of the two representations were closely related, the representations were

11

"simultaneous," and Elmore "never unambiguously terminated his representation" of Scott. *Id.* at 44–45 (citing *United States v. Infante*, citing 404 F.3d 376, 392 (5th Cir. 2005)). Harvey points to the fact that when Scott was on the stand, Elmore successfully objected to the questions that sought to elicit "confidential information" between him and his client. *Id.* at 42. Even if the representation was successive rather than simultaneous, Harvey argues that his interests conflicted with Elmore's duties towards his former client, Scott. *Id.* at 43 n.10.

Harvey then argues that this actual conflict adversely affected Elmore's representation because the trial prosecutor attempted to exploit the fact of Elmore's dual representation. *Id.* at 39. Harvey notes that the prosecutor referred to the dual representation in her closing and argued that Scott was obstructing justice. *Id.* at 46. Elmore was unable to testify about the reasons for his representation of Scott,[6] so the jury could have concluded Elmore was hired by Scott to protect Harvey, Harvey argues. *Id.* at 42. Harvey notes that Judge Cunningham, sitting as the PCRA court, held that Elmore "actively represented conflicting interests" by representing Harvey and Scott, which "adversely affected his performance by creating a negative narrative for [Harvey] at trial." *Id.* at 45–46 (quoting *Commonwealth v. Harvey*, Nos. CP-51-CR-0014937-2010, CP-51-CR-0014981-2010, PCRA Ct. Op. at 10 (Phila. C.P. Apr. 6, 2022)).

Harvey also argues Elmore's representation was ineffective under *Strickland*'s deficient performance and prejudice test because but-for

---

[6] During trial and in his declaration, Elmore claimed he had to testify about the scope of his representation of Shakeema Scott. NT 2/14/2013 at 134; Elmore Affidavit, Am. Pet. Ex. 2 ECF No. 28-2.

Elmore representing a witness in Harvey's trial, there was a reasonable probability of a different outcome. Elmore's dual representation made the jury less likely to believe Scott over Detective Murray about whether she had identified her boyfriend as the shooter, Harvey argues. *Id.* at 46–47. Harvey claims that but-for Elmore's dual representation, Scott would not have been questioned about her hiring a lawyer to avoid police questioning. *Id.*

Finally, Harvey argues that Elmore's representation of Terrence J. Hicks provides another basis for relief under *Sullivan* because Hicks was an alternate suspect. *Id.* at 47–48. Although Elmore elicited testimony from Scott that placed Hicks at the scene of the shooting, he never presented evidence of Hicks's involvement nor did he argue that Hicks had done the shooting, Harvey contends. *Id.*

Elmore has recently acknowledged that he represented Hicks, who he referred to at trial as "T.J." Elmore Affidavit Am. Pet. Ex. 2 ECF No. 28-2. Hicks was killed four days after the shooting and one month before the arrest. *Id.*[7] After speaking with Harvey's habeas counsel, Elmore determined it was "likely" that Harvey told him that Hicks was the one who shot complainants Thomas and Wright, and it is "possible" that he "may have unconsciously rejected that theory of defense because of my prior representation of Mr. Hicks." *Id.* Scott now claims that she told detectives that Hicks had done the shooting, but they "did not want to hear that." Scott Affidavit Am. Pet. Ex. 3 No. 28-3. As discussed in Section II, at

---

[7] Respondents have independently investigated Hicks and agree that the person Scott referred to as T.J. at trial was her sister's romantic partner, Terrence J. Hicks, who was killed on September 24, 2010.

trial Elmore elicited testimony from Scott about Hicks being present at the scene and that Hicks had a car.

### 1. Respondents agree that the procedural default of Harvey's conflict claim regarding Shakeema Scott is excused, but his related *Strickland* and Hicks claims are inexcusably defaulted.

Harvey acknowledges his ineffectiveness/conflict claim is procedurally defaulted. Indeed, Harvey's initial PCRA counsel did not argue that trial counsel Elmore had an actual conflict of interest in his initial, timely petition. When this claim was eventually raised in Harvey's serial, untimely PCRA petition, the PCRA court agreed with Harvey on the merits but ultimately acknowledged it was time-barred. The Superior Court then dismissed the claim as untimely without addressing the merits. Because the state court dismissed the claim on an adequate and independent procedural ground, it is procedurally defaulted. *See*, *e.g.*, *Holland v. Horn*, 519 F.3d 107, 115 (3d Cir. 2008) (noting PCRA's time-bar is "independent and adequate" to support a default in federal court).

He argues, however, that the default may be excused under *Martinez v. Ryan*, 566 U.S. 1 (2012). *Id.* at 48–50. As noted above, *Martinez* created an equitable exception to the general rules regarding cause and prejudice to excuse a default by holding that deficient performance by post-conviction counsel may constitute 'cause' under *Coleman*. *Martinez*, 566 U.S. at 14. In order to excuse a default under *Martinez*, an underlying claim of trial counsel ineffectiveness must have "some merit," meaning that it is reasonably debatable. *Preston v. Superintendent Graterford SCI*, 902 F.3d 365, 377 (3d Cir. 2018). Also, post-conviction litigation must generally be the first opportunity to raise the claim, and initial post-conviction counsel's failure

14

to raise the claim fell below an objective standard of reasonableness under *Strickland*. *Martinez*, 566 U.S. at 14; *Trevino v. Thaler*, 569 U.S. 413, 429 (2013). A petitioner may be able to show such deficiency by "showing that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." *Preston*, 902 F.3d at 902.

Respondents agree that Harvey's claim of trial counsel ineffectiveness as to the conflict with Shakeema Scott is excused under *Martinez*. First, in Pennsylvania, trial counsel ineffectiveness claims may generally be raised in the first instance on collateral review. *Commonwealth v. Holmes*, 79 A.3d 562, 583 (Pa. 2013). Second, though Respondents do not believe the claim succeeds on the merits, as discussed *infra*, Respondents agree that the claim has "some merit" within the meaning of *Martinez*, as the claim is arguably debatable. And third, instead of raising this claim that Judge Cunningham found meritorious, initial PCRA counsel raised "clearly weaker" ineffectiveness claims, including arguing that trial counsel was ineffective for failing to call six purported alibi witnesses, a claim that Judge Cunningham denied on the merits because Harvey failed to demonstrate how those witnesses would have helped him, and the evidence provided showed that Elmore was aware of the witnesses and chose not to present them as part of his trial strategy. *See Commonwealth v. Harvey*, Nos. CP-51-CR-0014937-2010, CP-51-CR-0014981-2010, Am. PCRA Pet. at 4–5 (Phila. C.P. Apr. 6, 2022) (arguing *inter alia* witnesses would have testified they were with Harvey at the time of the shooting); PCRA Ct. Op. at 8 (Phila C.P. Sept. 12, 2019). So, because Harvey's claim regarding Scott has some merit and because initial PCRA counsel failed to raise this claim, instead raising clearly weaker claims for no discernable strategic reason, Respondents agree that the default of this claim is excused pursuant to *Martinez.*

15

However, as to Harvey's first related claim regarding an alleged conflict with deceased witness Hicks, the claim does not have "some merit" and post-conviction counsel was not unreasonable in failing to raise it, so it remains defaulted. Indeed, Hicks was shot and killed four days after the shooting, five weeks before Harvey's arrest, and more than two years before his trial. At trial, Elmore elicited testimony from Scott that Hicks was outside nearby where the shooting occurred the night of the shooting and had a car—unlike Harvey or Brian Scott, according to Scott. Hicks had no interest in the way Elmore conducted the defense of Harvey years after Hicks's death. Elmore now allows for the possibility that he may have "unconsciously" discounted a theory that Hicks was the shooter because of his prior representation. Even if that did happen, it would not amount to "actively" representing conflicting interests. *See Cuyler v. Sullivan*, 446 U.S. 335, 349–50 (1980).  It is unsurprising that Elmore did not introduce more evidence suggesting Hicks as an alternate suspect since no corroborating evidence for that theory existed.[8]. There was no conflict of interest and no adverse representation; Harvey's ground regarding Elmore's prior representation of Hicks is not substantial; and so this related claim remains procedurally defaulted without excuse and otherwise without merit.

---

[8] Scott's recent claim that Hicks fired the shots contradicts her testimony that she could not tell what direction the gunshots were coming from. NT 2/13/2013 at 139. Scott does not explain why after telling the police the purported truth that Hicks did the shooting, she then claimed ignorance when Harvey was on trial. Scott's recent statement is not credible and therefore does not rebut the state court's factual findings that Harvey shot Thomas and Wright by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Commonwealth v. Harvey*, 2016 WL 6090815 at *1 (Pa. Super. Ct. Oct. 18, 2016).

16

Harvey's second related claim that Elmore was ineffective under *Strickland* for representing witness Scott is similarly defaulted without excuse. Indeed, even assuming Elmore's performance was deficient, which Respondents do not concede for the reasons explained below, Harvey cannot show a reasonable likelihood of a different outcome had Elmore never represented Scott as there was significant evidence of Harvey's guilt. *See Strickland v. Washington*, 466 U.S. 668, 693 (1984).

The two complainants identified the shooter as Shakeema Scott's boyfriend and father of her child, selected Harvey and his accomplice Brian Scott out of photo arrays, and identified Harvey in court. Darnell Thomas had shaken Harvey's hand and spoken to him. Donnell Wright had witnessed that conversation and saw Harvey shooting out a car window at him. Wright, at trial, and Thomas, in an initial police interview, had said they visited Scott that day because she had been in an argument. Shakeema Scott testified that Harvey was the father of one of her children at the time and acknowledged that he was at her apartment the night of the shooting. Detective Murray testified that Scott told him her boyfriend "G" had done the shooting. Although Scott denied having told that to Detective Murray, her claim that she never talked to police that night was undercut by the fact that two days after the shooting her lawyer, Elmore, told police she wanted to cease cooperation and avoid making "anymore" statements to police. There is simply nothing to suggest that Elmore's representation of Scott undermines confidence in outcome here considering the record support for the jury's verdict. *See Strickland*, 466 U.S. at 696 (noting that "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support"). Because this claim is insubstantial, post-conviction counsel was not deficient in

17

failing to raise it and it remains inexcusably defaulted and otherwise without merit.

## 2. Elmore did not labor under an actual conflict of interest that negatively affected his representation of Harvey when he represented witness Scott.

When trial counsel's ineffectiveness is based solely on counsel having an actual conflict of interest, the petitioner does not need to demonstrate actual prejudice. *Cuyler v. Sullivan*, 446 U.S. 335, 348–50 (1980). Instead, if the petitioner shows counsel "actively represented conflicting interests" and that conflict "adversely affected his lawyer's performance," then prejudice is presumed. *Id.* An actual conflict of interest is different from a potential conflict of interest. *Id.* at 348. An actual conflict only exists where counsel's jointly represented parties' "interests diverge with respect to a material factual or legal issue or to a course of action." *United States v. Gambino*, 864 F.2d 1064, 1070 (1988) (citing *Sullivan v. Cuyler*, 723 F.2d 1077, 1086 (3d Cir. 1983)); *United States v. Savage*, 85 F.4th 102, 117 (3d Cir. 2023) (observing that "nothing in the trial record suggests that [counsel's] interests ever diverged from [petitioner's]"). An attorney jointly representing different criminal defendants in the same proceeding is "suspect" because of the potential for ineffective representation but that is not "*per se* violative" of the Sixth Amendment. *Holloway v. Arkansas*, 435 U.S. 475, 482, 489–90 (1978). Where an attorney with multiple clients takes an action that is in both clients' interests, that is a "coincidence of interests." *Gambino*, 864 F.2d at 1071.[9]

---

[9] Harvey suggests this Court use a multi-factor test to determine whether an actual conflict existed. *See* ECF No. 28 at 41 (citing *United States v. Infante*, 404 F.3d 376, 392 (5th Cir. 2005)). The *Infante* court was attempting to resolve

Further, such an actual conflict must cause counsel's adverse performance. *Id.* at 1070; *see also Burger v. Kemp*, 483 U.S. 776, 784–85 (1987) (holding that counsel's challenged decision must be "attribut[ed]" to dueling loyalties for an actual conflict to exist). Indeed, to make such a showing of adverse performance, a petitioner must show "some plausible alternative defense strategy or tactic might have been pursued" but wasn't "due to the attorney's other loyalties or interests." *United States v. Vetri*, No. 23-1208, 2024 WL 4056599, at *2 (3d Cir. Sept. 5, 2024) (non-precedential) (quoting *Gambino*, 864 F.2d at 1070). Whether counsel operated under an actual conflict of interest that adversely affected his performance is a mixed question of law and fact subject to de novo review. *Sullivan*, 446 U.S. at 341–42.[10]

---

whether the attorney was conflicted even though the two prosecution witnesses he previously represented had already pled guilty and been sentenced when they testified in petitioner's trial. *See Infante*, 404 F.3d at 389–92. The issue in *Infante* was the attorney's dual representation had arguably ceased by the time of petitioner's trial. *See id.* at 391 n.12, 392. Thus, in analyzing whether an actual conflict existed, the *Infante* court focused on temporal and subject-matter overlap as well as whether representation of one client had "been unambiguously terminated." *See id.* The *Infante* court still had to find an actual conflict to warrant relief. *Id.* at 392–93 ("[The attorney] had to choose between vigorously cross-examining his former clients, which might jeopardize [their favorable treatment by the government], and not vigorously cross-examining them, which would risk allowing the government to establish through their testimony an essential element against [petitioner] . . ."). Thus, the *Infante* factors do not supplant the *Sullivan* test or recently reaffirmed Third Circuit case law.

[10] To the extent the PCRA court made a factual finding that Elmore represented both Harvey and Scott simultaneously, that finding is presumed correct here absent clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1). The PCRA court's legal conclusions are due no deference.

In *Taylor v. Superintendent Dallas SCI*, an attorney jointly represented the petitioner and—up until eleven days before petitioner's trial—an informant against the petitioner in an open federal case. No. 23-2511, 2024 WL 4449417, at *1–2 (3d Cir. Oct. 9, 2024) (non-precedential). At trial the attorney cross-examined the informant about a letter the informant had written wherein the informant claimed the attorney had tried to dissuade him from testifying against the petitioner. *Id.* The court held that while the representation was "unquestionably poisoned by an actual conflict" in the months leading up to trial, it was unclear whether that conflict persisted at trial, and the petitioner had failed to prove that any such conflict adversely affected the attorney's performance. *Id.* at *5–6. Although the discussion about the informant's letter could have "left jurors with the impression that [the attorney] tried to silence a prosecution witness," that impression "would not have stemmed from a conflict of interest." *Id.* So too here.

Harvey's claim fails both because there was no actual conflict and any such conflict did not adversely affect Elmore's performance. First, Scott and Harvey had a "coincidence of interests" in preventing Harvey's conviction, as opposed to materially different interests. *See Gambino*, 864 F.2d at 1071. Harvey has pointed to no point in Elmore's representation where their interests diverged, and none are apparent from the record.[11] It is not enough to say that Elmore had "confidential information" from Scott that "implicated" Harvey's case. *See* ECF No. 28 at 41. When Elmore actively represented Scott in September 2010, both Harvey and Scott were interested

---

[11] Scott's interests arguably diverged from Harvey's when, in the immediate aftermath of the shooting, she told Detective Murray that her boyfriend G had done it. But there is no suggestion that Elmore represented her at that time.

20

in her not giving a statement to police about the shooting with which Harvey was later charged. While Scott was called by the Commonwealth at trial, her testimony was in Harvey's interests in that it supplied a purported alibi, refuted the accounts of the complaining witnesses who accused him, and contradicted the inculpatory testimony that Detective Murray gave the next day. Therefore, when the prosecutor sought to impeach Scott by questioning her about whether she hired Elmore to impede the investigation into the shooting, Harvey and Scott had a coincidence of interests for Elmore to object based on attorney-client privilege. Because there was no point at which Elmore "actively represented conflicting interests," there was no actual conflict despite dual-representation.

Even assuming *arguendo* that the *fact* of the dual representation may have adversely affected Harvey, that is not the relevant standard. As explained more fully above, recent case law in this circuit reiterates that there must be a causal link between an actual conflict and an adverse effect on trial counsel's performance. *See Vetri*, 2024 WL 4056599, at *2. The trial prosecutor's exploitation of the fact that Scott hired an attorney to avoid police questioning in a case where her boyfriend was later arrested was categorically not an aspect of trial counsel's performance. Nor did any negative impression of Harvey "stem[] from a conflict of interest." *Taylor*, 2024 WL 4449417, at *6. Likewise, Elmore's inability to testify about his representation of Scott did not stem from a conflict between the interests of Scott and Harvey, but rather because of Elmore's role as trial counsel.[12]

---

[12] The Pennsylvania Rules of Professional Conduct permit trial counsel to testify about the "nature and value of legal services rendered in the case." Pa. R. Prof. Conduct 3.7(a)(2). To the extent Elmore wanted to testify about more than that, he was prevented by his ethical obligation not to be a general witness in the same trial where he represented Harvey. *See* Pa. R.

Indeed, Harvey has pointed to no "alternative defense or tactic" that was not pursued due to Elmore's alleged dual loyalties, and Respondents are unaware of any. Thus, Harvey's claim under *Sullivan* with respect to Scott is without merit and should be rejected.[13]

**B. Harvey's Ground Two is procedurally defaulted without excuse because Elmore had strategic reasons to avoid attempting to prove that the photo he tried to introduce was the same one the complainants had used to identify the shooter on Facebook.**

In his Ground Two, Harvey argues trial counsel Elmore was ineffective for failing to obtain and make use of the Facebook photo that complainants Darnell Thomas and Donnell Wright had identified as depicting the shooter. ECF No. 28 at 50. Harvey claims that Elmore did obtain a copy of that photo but failed to take the steps to authenticate it or to demonstrate its relevancy to Harvey's case by showing it to either of the complaining witnesses or to Scott. *Id.* As discussed above, to succeed on this claim

---

Prof. Conduct 3.7(a). That ethical bar would prohibit Elmore's testimony regardless of his representation of Scott. Therefore, Elmore's dual representation of Harvey and Scott was not the cause of his inability to testify in Harvey's case.

[13] Sitting as the PCRA court, Judge Cunningham concluded differently. Judge Cunningham found that Elmore represented both Scott and Harvey at the trial and the prosecutor "managed to create the impression that trial counsel was attempting to prevent a witness from testifying against [Harvey]." *Commonwealth v. Harvey*, Nos. CP-51-CR-0014937-2010, CP-51-CR-0014981-2010, PCRA Ct. Op. at 10 (Phila. C.P. Apr. 6, 2022)). The state court's factual findings are presumptively correct, *see* 28 U.S.C. § 2254(e)(1), but Judge Cunningham's legal conclusion that this amounted to an actual conflict that adversely affected trial counsel's performance is reviewed *de novo*. *See Buehl v. Vaughn*, 166 F.3d 163, 169 (3d Cir. 1999). To the extent that decision falls within the ambit of § 2254(d), it is contrary to clearly established federal law for the reasons explained above.

22

Harvey must show that his trial counsel's performance fell below an objective standard of reasonableness and that, but-for those unprofessional errors, there is a reasonable probability of a different outcome. *Strickland*, 466 U.S. at 693–94.

As discussed briefly in Section II, complainants Wright and Thomas showed Detective Murray a photo found on Facebook that they identified as depicting the shooter. Pretrial, Elmore complained he had not received the photo, NT 11/14/2011 at 5–10, and sought to suppress the identifications because of the missing photo, NT 2/11/2013 at 26–31. The suppression motion was denied because the missing Facebook photo was not relevant to the identifications. *Id.* at 53–55.

Detective Murray did not have the photo at trial, and Wright was unable to find a copy in his email. 2/15/2013 at 39–41. There was contradictory testimony about whether a copy of the Facebook photo was given to Detective Murray. Darnell Thomas testified that he found the photo on Scott's Facebook page and gave a printout to police. NT 2/12/2013 at 93, 114. Donnell Wright testified that his wife and Thomas's girlfriend found the photo, and he emailed it to Detective Murray. NT 2/13/2013 at 41–42, 110–11. Detective Murray testified that he did not think it was important to preserve the photo, which he believed was shown to him on a phone and was not emailed to him. NT 2/14/2013 at 42–43, 66. Wright and Thomas were both certain that the Facebook photo they showed Detective Murray depicted the shooter. NT 2/12/2013 at 95 ("a thousand percent sure"); NT 2/13/2013 at 119 ("150 percent sure"). Thomas described the photo as depicting the shooter kneeling on the ground with Scott and two other women and wearing the same "weird looking" hat that he had worn the night of the shooting. NT 2/12/2013 at 115–16. Wright described the

23

photo as depicting the shooter with two other people, wearing a green fisherman's hat. NT 2/13/2013 at 119–20. Detective Murray recalled the setting of the photo as a "bar or a pool hall." NT 2/14/2013 at 90. At trial, Elmore took a photo from Scott's Facebook page that did not feature Harvey and marked it as D-7, arguing that **this** photo was the missing photograph. When Elmore showed Detective Murray a copy of a photo marked D-7[14] at trial depicting three women and a man in a hat, Murray testified that he had never seen it before. NT 2/14/2013 at 91.

---

[14] The photo is reproduced as Am. Pet. Ex. 1 Photo, ECF No. 28-1 (hereinafter "Photo D-7"). The record is unclear how Elmore obtained Photo D-7. At a pretrial hearing where counsel discussed the missing Facebook photo, Elmore said a photo a prosecutor had just showed him was "not my client." NT 11/14/2011 at 5. During the trial, Elmore told the judge he had received Photo D-7 from the Commonwealth. NT 2/15/2013 at 6. Elmore and Shakeema Scott now claim that Scott and her siblings helped procure the photo for Elmore. Scott Affidavit Am. Pet. Ex. 3 ECF No. 28-3 at 3, Elmore Affidavit Am. Pet. Ex. 2, ECF No. 28-2 at 4. It is likely that although the specific photo the complainants showed Detective Murray was not retained, the Commonwealth passed Harvey photos obtained from Scott's Facebook page, including Photo D-7.

That photo is reproduced below:



In his closing, Elmore speculated that Detective Murray did not keep the Facebook photo because it disproved his case against Harvey. NT 2/15/2013 at 53–54. The jury asked to see Photo D-7, but it was not entered as an exhibit because no one had authenticated it. NT 2/15/2013 at 44–45, 142–43. Scott now claims police showed her Photo D-7 from her Facebook, depicting herself, two women, and her brother Preston Reeves. Scott Affidavit Am. Pet. Ex. 3, ECF No. 28-3 at 3. Scott alleges the police insisted the man in the photo was Harvey, and not Reeves. *Id.*

Harvey now argues it is "reasonably clear" that Photo D-7 **is** the Facebook photo that Thomas and Wright showed police because Photo D-7 depicts three women standing and a man kneeling and wearing a hat. ECF No. 28 at 51. Harvey's speculation is far from clear.

25

Harvey further argues that Elmore had no strategic reason to refrain from showing Photo D-7 to Thomas and Wright or Scott during trial because his trial strategy was, in part, to suggest that Harvey was not the man depicted in the Facebook photo. *Id.* at 52. Rather, Harvey suggests that the reason Elmore was unable to effectively use the photo was because of his unfamiliarity with Facebook. *Id.* at 52–53.

Harvey argues that Elmore's deficient performance prejudiced him because there was a "reasonable probability [Thomas and Wright] would have admitted" that Photo D-7 was the Facebook photo they identified, and it clearly depicted someone other than Harvey. *Id.* at 53. This would be prejudicial, Harvey argues, because the complainants' identification of Harvey was otherwise marred by inconsistencies in their descriptions and because of their prior unfamiliarity with Harvey. *Id.* at 54–55.[15]

This claim was not raised in state court, and as Harvey acknowledges, it is procedurally defaulted. *Id.* at 57. Harvey claims, however, that default

---

[15] Harvey also argues that Darnell Thomas's identification of Harvey in the photo array was flawed because during cross-examination, Thomas said, "They didn't show me photos of your client. I found your client." NT 2/12/2013 at 102. This remark was made in response to Elmore accusing Thomas of identifying wrong people after Thomas had (mistakenly) testified that he never identified the accomplice. *Id.* at 96–101. Thomas's response was to distinguish his identification of the accomplice, where police had provided him with a photo array, from his identification of Harvey, where police only provided a photo array after Thomas had already shown police the Facebook photo of the shooter. *Id.* at 102. When Elmore showed Thomas a photo of the accomplice, he testified that he did recognize him. *Id.* at 104; *see also* NT 2/13/2013 at 148–49 (identifying Trial Ex. D-3 as a photo of Brian Scott). Thomas remembered Detective Murray coming to his house and showing him a photo array from which Thomas identified Harvey. NT 2/12/2013 at 116–17.

is excused under *Martinez v. Ryan*, 566 U.S. 1 (2012) because PCRA counsel was ineffective for not raising the claim of trial counsel ineffectiveness. *Id.* at 57.

Default is not excused here because the underlying claim of trial counsel ineffectiveness for failing to introduce Photo D-7 as evidence and use it to question witnesses is not substantial.

Because this claim was not raised in state court, there is no record of what strategy, if any, supported Elmore's decision not to show the Facebook photo to Thomas or Wright at trial, and that record cannot be developed now. *See* 28 U.S.C. § 2254(e)(2); *Shinn v. Ramirez*, 596 U.S. 366, 383 (2022). *Cf. Williams v. Superintendent Mahanoy SCI*, 45 F.4th 713 (3d Cir. 2022) ("AEDPA does not allow us to excuse Williams's separate failure to develop the record just because his state post-conviction lawyer did a bad job."). Where trial counsel's strategy is unclear and/or unknown, his performance is considered reasonable if it is supported by any reasonable basis and is supportive of any one of the "countless" sound trial strategies possible. *Strickland*, 466 U.S. at 689. Indeed, the petitioner must overcome the "strong presumption" that counsel's behavior was reasonable, a presumption that has "particular force" when an ineffectiveness claim is based "solely on the trial record" like the one presented here. *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003).

Here, Harvey cannot meet his burden and rebut the presumption that Elmore's actions had a reasonable basis. Indeed, it seems to Respondents that Elmore could have had a clearly strategic reason not to show Photo D-7 to Thomas or Wright because of the likelihood that Photo D-7 was an entirely different photo than the Facebook photo the complainants identified. As Harvey himself acknowledges, there is no certainty whether

Thomas or Wright would have testified that Photo D-7 was the Facebook photo of the shooter, but only a "reasonable probability." It would have been a gamble for Elmore to present Photo D-7 to Thomas or Wright because if they denied that Photo D-7 was the photo they identified that would topple the defense theory that they had earlier correctly identified someone other than Harvey.[16] It was less risky to show Photo D-7 to Detective Murray because Elmore could argue, as he did, that Detective Murray was uncredible and wanted to pin the crime on Harvey despite contradictory evidence. The fact that the jury requested Photo D-7 indicates Elmore was effective at suggesting it might be the Facebook photo the complainants identified. Elmore's inexperience with using Facebook did not impair him since the photo he wanted to use went missing. Under that unfortunate circumstance, it was a reasonable strategy to sow ambiguity about whether Photo D-7 was the missing photo. Setting aside Scott's recent uncredible claim that police showed her a Facebook photo depicting Reeves (from whom the police learned Harvey's name), Scott would be unable to connect Photo D-7 to the case because its relevance hinged on whether it was used by the complainants to identify the shooter.

Additionally, Harvey cannot show that he was prejudiced by Elmore's alleged deficiency here. Harvey's prejudice argument requires this Court to accept the shaky factual premise that Photo D-7 was the Facebook photo used by Thomas and Wright to initially identify the shooter. Even if that

---

[16] Even asking the complainants outside of court would have been perilous because if the complainants unequivocally denied that Photo D-7 was the photo they had identified on Facebook, Elmore would be ethically constrained from making that argument at trial. *See* Pa. R. Prof. Conduct 3.3(a)(1) (barring attorneys from making a false statement of material fact to a court).

28

were true, that contrary identification evidence would stack up against the substantial evidence of Harvey's guilt. Wright and Thomas each identified Harvey and his accomplice in photo arrays and identified Harvey at trial. Shakeema Scott had told Detective Murray the night of the shooting that her boyfriend was the shooter, which was consistent with Wright and Thomas identifying the shooter as Scott's boyfriend.

For the foregoing reasons, Harvey's ground two is not substantial within the meaning of *Martinez*, his post-conviction counsel's failure to raise it did not fall below an objective standard of reasonableness, and it remains both inexcusably defaulted and otherwise without merit.

### C. Ground Three is procedurally defaulted without excuse and otherwise without merit.

In Ground Three, Harvey argues that the suppression of impeachment evidence against Detective Murray violated *Brady v. Maryland*, 373 U.S. 83 (1963). ECF No. 28 at 58. Harvey acknowledges the claim was procedurally defaulted, but argues default is excused because it is a meritorious *Brady* claim. *Id.* at 63.

On June 10, 2021, the District Attorney's Office disclosed to Harvey's PCRA counsel evidence of misconduct by Detective Murray. ECF No. 28-7. More information was subsequently provided on April 26, 2022. ECF No. 28-8. Those disclosures revealed that the Philadelphia Police Internal Affairs Division concluded in 2006 that Detective Murray had lied in a 2004 preliminary hearing. *Id.* Murray, who was then a police officer in the Narcotics Strike Force, testified that he had listened in as a confidential source called a drug dealer on his phone. *Id.* at 7. In fact, the confidential source told authorities in an interview that she had called the drug dealer

29

from her home when police were not present. *Id.* at 11. In a subsequent interview with Internal Affairs, the confidential source claimed she had used a police officer's phone to call the dealer on the day in question. *Id.* at 12. An investigation into phone records and interviews of other people at the scene concluded that the confidential source had not made the call using Murray's phone; Murray gave false testimony; and he made a false statement in response to the department's investigation. *Id.* at 22–24. Separately in 2018, in connection with another case from that year, the District Attorney's Office concluded that Detective Murray's account of the search and seizure of a cell phone and clothing of a hospitalized suspect was "not credible." *Id.* at 25–30.

Harvey never raised a claim based on the Detective Murray impeachment evidence in state court.

Because more than a year has passed since Harvey was provided with the disclosures about Detective Murray, he no longer has the opportunity to raise this *Brady* claim in state court, so it is procedurally defaulted here. Harvey argues that he can show cause and prejudice for defaulting the *Brady* claim because it is a "meritorious" claim. ECF No. 28 at 63 (citing *Banks v. Dretke*, 540 U.S. 688, 691 (2004)).

*Banks* held, a "petitioner shows 'cause' when the reason for his failure to develop facts in state-court proceedings was the State's suppression of the relevant evidence." *Banks*, 540 U.S. at 691. That type of suppression is akin to the suppression prong of a *Brady* claim. *Id.* Although *Banks* decided suppression of evidence could excuse the failure to develop the factual basis for his claim in state court, *id.* at 690–91, the analysis applies equally to excuse procedural default, *see id.* at 692–93 (citing *Strickler v. Greene*, 527 U.S. 263, 289 (1999)); *Johnson v. Folino*, 705 F.3d 117, 128 (3d Cir. 2013). In *Banks*,

30

through direct appeal and state collateral review, the state "persisted in hiding" impeachment evidence and "misleadingly represented that it had complied in full with its *Brady* disclosure obligations." *Banks*, 688 U.S. at 675, 683, 693.

The default of Harvey's *Brady* claim is not excused under *Banks* because the Commonwealth's suppression of evidence was not the reason that Harvey failed to timely exhaust the claim in state court. Unlike *Banks*, here the Commonwealth disclosed the information to Harvey during his PCRA proceedings. Harvey had one year to raise a timely *Brady* claim based on the information the Commonwealth disclosed but he did not. There is no allegation the Commonwealth played any part in Harvey waiting more than a year to file a PCRA petition raising a *Brady* claim based on the disclosures, so *Banks* is of no use to him.

Even if the default could be excused under *Banks*, which it cannot, the claim would remain meritless. To succeed on a *Brady* claim, a petitioner must prove that the evidence at issue was favorable to the defendant; the favorable evidence was suppressed by the state, either willfully or inadvertently; and the favorable evidence was material such that its suppression caused prejudice. *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). Suppressed, favorable evidence is material if, considering the record as a whole, there is a reasonable probability of a different outcome. *United States v. Bagley*, 473 U.S. 667, 682 (1985). A reasonable probability is a probability sufficient to "put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995).

In this case, though Respondents agree the new evidence was suppressed and is favorable in terms of a *Brady* analysis, the impeachment evidence against Detective Murray was not material because it does not put

31

the case in a different light as to undermine confidence the verdict. Indeed, Darnell Thomas and Donnell Wright testified consistently with one another and both identified Harvey as the shooter in a photo array and at trial. Both also identified the shooter as Shakeema Scott's boyfriend, who was Harvey. It is unclear how impeaching Detective Murray would have undermined the substantial evidence of Harvey's guilt testified to by Thomas and Wright. While the impeachment evidence may have undercut Detective Murray's testimony that he spoke to Scott on the night in question and she told him her boyfriend had done the shooting—and consequently buttressed Scott's testimony that she had not spoken to Detective Murray that night—Detective Murray's account was corroborated by the letter Elmore subsequently sent detectives that Scott did not want to make "anymore" statements. Additionally, it is of no moment that the jury may have been less inclined to believe Detective Murray that he had never seen Photo D-7 before since there was no actual evidence that Photo D-7 was the photo that Wright and Thomas had shown police as depicting the shooter in this case. In short, the newly disclosed evidence that could have been used to impeach Detective Murray does not undermine confidence in the outcome here because its impact on the case would have been tangential at best.

Thus, no relief is due on Harvey's *Brady* claim both because it is inexcusably defaulted and otherwise without merit.


IV.    CONCLUSION

For the foregoing reasons, Respondents respectfully request that this Court deny Harvey's Ground One with respect to an actual conflict

between Elmore and Shakeema Scott as meritless, and dismiss the rest of

Harvey's petition as procedurally defaulted and otherwise meritless.


Respectfully submitted,



/s/ *Andrew Metzger*
Andrew Metzger
Assistant District Attorney
Federal Litigation Unit
Office of the District Attorney
3 South Penn Square
Philadelphia, PA 19107

*Counsel for Respondents*

**CERTIFICATE OF SERVICE**

I hereby certify that on this January 9, 2025, a copy of the foregoing

response was served on the following counsel for Petitioner via this Court's

CM/ECF electronic filing system.

>Claudia Flores
>Assistant Federal Defender
>Federal Community Defender Office for the
>Eastern District of Pennsylvania
>601 Walnut Street
>The Curtis Center, Suite 540 West
>Philadelphia, PA 19106

>/s/ *Andrew Metzger*
>Andrew Metzger
>Assistant District Attorney
>Federal Litigation Unit
>Office of the District Attorney
>3 South Penn Square
>Philadelphia, PA 19107
>
>*Counsel for Respondents*