**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **WILLIAM HARVEY,** | : | **CIVIL ACTION** |
| **Petitioner,** | : | |
| | : | |
| **v.** | : | **NO. 23-4539** |
| | : | |
| **JOSEPH TERRA, et al.,** | : | |
| **Respondents.** | : | |

**MEMORANDUM IN REPLY TO RESPONDENTS' RESPONSE TO
PETITIONER'S AMENDED HABEAS PETITION**

Petitioner, William Harvey, through counsel, hereby replies to the Commonwealth's

response to his consolidated amended habeas corpus petition and memorandum of law.

Herein, Petitioner replies to Respondents' arguments on Claims A through C. Because the

Commonwealth waived the statute of limitations defense in its response, ECF No. 35 at 9,

Harvey rests on his opening brief with respect to his arguments regarding equitable tolling.

**A.    Harvey's Sixth Amendment Rights Were Violated by Trial Counsel's
Concurrent Representation of a Prosecution Witness, Which Constituted
an Actual Conflict of Interest**

Elmore's concurrent representation of Shakeema Scott while he represented Harvey

at trial was an actual conflict of interest that resulted in clear adverse effect for Harvey. In

its response, the Commonwealth misapplies clearly established federal law and fails to

accord deference to the state court's decision finding that Elmore's clear and egregious

conflict of interest warrants a new trial. With respect to Elmore's representation of

Terrence Hicks, Harvey can overcome any procedural default because he presents a

substantial claim demonstrating that Elmore's divided loyalties caused adverse effect at trial.

**1. The PCRA court's decision on the merits is entitled to AEDPA deference**

In its response, the Commonwealth argues that Elmore did not labor under an actual conflict and that any such conflict did not adversely affect his performance. ECF No. 35 at 20. The PCRA court, when addressing Harvey's claim on the merits in a thorough opinion, concluded differently, finding that Elmore had an active conflict of interest by representing both Harvey and Scott and that the conflict adversely affected his performance by creating a negative narrative for Harvey at trial, amounting to structural error. 4/6/22 PCRA Court Opinion at 7, 10. The Commonwealth concedes that the PCRA court's factual findings are due deference under 28 U.S.C. § 2254(e)(1), but argues without support that its legal conclusions are not entitled to deference under § 2254(d). ECF No. 35 at 22, n.13.

Contrary to the Commonwealth's assertion, the PCRA court's legal conclusion is entitled to deference under 28 U.S.C. § 2254(d), notwithstanding its ultimate dismissal of Harvey's PCRA petition on procedural grounds. Because the Superior Court denied Harvey's conflict claim on timeliness grounds without addressing the merits, this Court must "look through" to the last reasoned state court decision, that of the PCRA court. *Brumfield v. Cain*, 576 U.S. 305, 313 (2015). Looking to Judge Cunningham's opinion, he was constrained to agree that Harvey's petition was untimely, but held that if the Superior Court were to find it timely, Harvey would be entitled to relief on the conflict of interest claim. 4/6/22 PCRA Court Opinion at 12. Even if Judge Cunningham's opinion is treated

2

as an alternative merits ruling, it must be afforded AEDPA deference. "[I]n referencing 'adjudication on the merits,' AEDPA draws no such distinction for alternative rulings. Rather, it suggests that where a state court has considered the merits of the claim, and its consideration provides an alternative and sufficient basis for the decision, such consideration warrants deference." *Rolan v. Coleman*, 680 F.3d 311, 321 (3d Cir. 2012) (discussing holdings of numerous sister circuits coming to the same conclusion and the Supreme Court's guidance in *Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989)).

The Commonwealth's argument that the PCRA court's decision is contrary to clearly established federal law is similarly without support. The Commonwealth points to no Supreme Court precedent foreclosing relief under the circumstances presented in Harvey's case, instead relying on a recent Third Circuit decision involving plainly distinguishable facts to argue that no conflict existed here. For the reasons discussed below, Elmore's representation of Harvey and Scott fell squarely under the precedent established by the Supreme Court in *Sullivan* and subsequent cases. *See Cuyler v. Sullivan*, 446 U.S. 335 (1980).

### 2. Elmore labored under an actual conflict of interest that caused adverse effect at trial

As the Commonwealth concedes, the PCRA court's factual finding that Elmore simultaneously represented both Harvey and Scott is entitled to deference under 28 U.S.C. § 2254(e)(1). ECF No. 35 at 20. Accordingly, Elmore "actively represented conflicting interests" at the time of trial. *Sullivan*, 446 U.S. at 350. To the extent the Commonwealth questions whether an actual conflict existed causing adverse effect at trial, that assessment

3

turns on factual determinations already passed on by the PCRA court and is thus entitled to deference. In any event, the Commonwealth's arguments misapply controlling case law and distort the record in Harvey's case.[1]

The Commonwealth relies on the Third Circuit's recent decision in *Taylor v. Superintendent Dallas SCI*, No. 23-2511, 2024 WL 4449417 (3d Cir. Oct. 9, 2024), to argue that, even where an attorney has previously represented a prosecution witness, that representation does not necessarily result in an actual conflict at trial if there is no adverse effect. *See* ECF No. 35 at 20. In *Taylor,* in contrast to Harvey's case, trial counsel had taken a number of precautions to ensure that his prior representation of the government's informant did not affect his representation of Taylor at trial. Taylor's counsel formally withdrew from representing the informant once he learned he would be a witness at Taylor's trial, explained the conflict to Taylor and ensured that he was "okay with everything," consulted with an ethics expert as to how to handle the prior representation,

---

[1] Harvey did not allege a "related claim" that trial counsel was ineffective under *Strickland*. ECF No. 35 at 17. Harvey raised a conflict of interest claim, which is "[o]ne type of actual ineffectiveness claim" governed by the Sixth Amendment right to counsel. *Strickland v. Washington*, 466 U.S. 668, 692 (1984). The applicable standard of review if a court determines that an actual conflict of interest existed is whether it caused "adverse effect" at trial. *Sullivan*, 446 U.S. at 350. In his memorandum of law, Harvey argues that Elmore's dual representation was ineffective assistance even under *Strickland*'s more onerous standard of review for prejudice, but maintains that the applicable standard of review is the relaxed prejudice analysis under *Sullivan*. ECF No. 28 at 46-47. Accordingly, the Commonwealth's concession that the procedural default of Harvey's conflict claim is excused under *Martinez* because it has "some merit," ECF No. 35 at 15, should apply to any "related claim" analyzed under *Strickland*.

and informed the court of the overlapping representation before trial began. 2024 WL 4449417 at *2.

Elmore took none of these precautions. He never terminated his representation of Scott, and she was still under the impression that Elmore was her attorney when she testified at Harvey's trial. *See* 7/2/24 Berto Elmore Declaration at ¶ 5 (ECF No. 28-2); 7/12/24 Shakeema Scott Declaration at ¶ 8 (ECF No. 28-3). Elmore "never did any research into the conflict question, nor did [he] seriously consider it." Elmore Declaration at ¶ 5. Although he mentioned the conflict to Harvey and Scott, he did not ask either of them to waive it. *Id.* And he never consulted with outside counsel about the conflict or informed the trial court that it existed. To the contrary, Elmore left the trial court with the impression that the conflict had been resolved, after initially assuring the court that he would look into it. He then moved forward with his representation of Harvey at trial, despite still representing Scott, and previously representing two other people potentially involved in the shooting, Terrence Hicks and Clifton Jones. N.T. 11/16/10 at 3, 35; Elmore Declaration at ¶ 6.  The trial court, which observed the  direct examination of Shakeema Scott, and the highly prejudicial arguments the prosecutor was able to make as a result, understandably concluded that an actual conflict existed that resulted in a disastrous adverse effect for Harvey at trial. 4/6/22 PCRA Court Opinion at 12 (holding that an evidentiary hearing was not necessary because "the testimony that the Commonwealth elicited . . . was of such a prejudicial and inflammatory nature that no court instruction would be able to rectify").

The Commonwealth argues that no actual conflict existed because Elmore and Harvey supposedly had a "coincidence of interests" when Elmore objected to Scott's testimony on privilege grounds. ECF No. 35 at 20-21. Although the Commonwealth speculates that Harvey and Scott's interests *may* have been globally aligned, their interests during Scott's questioning by the prosecutor materially diverged. And any testimony Scott provided that was helpful to Harvey's case – an alibi and her contradiction of the police and complaining witness accounts – was undermined by the prosecution's suggestion that she was obstructing justice to protect Harvey from the outset. *See* ECF No. 35 at 21.

The assertion that Harvey and Scott "had a coincidence of interests for Elmore to object based on attorney-client privilege" is simply not borne out by the record at trial. *Id.* The jury heard that Scott had hired Elmore, and that Elmore had reached out to Detective Murray to prevent him from questioning Scott when the Commonwealth introduced Elmore's September 22, 2010 letter into evidence. N.T. 2/14/13 at 25-27. Elmore's assertion of privilege left the jury with the unrebutted impression that Harvey and Elmore wanted to conceal Scott's reasons for hiring Elmore because they were precisely what the prosecutor suggested, protecting Harvey and obstructing justice. In fact, Harvey's interest was in allowing Scott to correct the impression created by the prosecutor when she asked if Scott hired Elmore to prevent Southwest Detectives from questioning her. In the moment she was questioned by the prosecutor, Scott's interest was in protecting confidential conversations she had with Elmore regarding the reasons she retained him.

6

There is no indication that Scott was attempting to obstruct justice or that Elmore and Harvey wanted to conceal her reasons for hiring Elmore at trial. To the contrary, Elmore was prepared to provide a detailed explanation for why he was hired, but prevented Scott's testimony on that subject, acting effectively on Scott's behalf but ineffectively on Harvey's, thus clearly forgoing a "plausible alternative defense strategy or tactic might have been pursued." *United States v. Gambino*, 864 F.2d 1064, 1070 (3d Cir. 1988) (quoting *United States v. Fahey*, 769 F.2d 829, 836 (1st Cir. 1985); *id.* ("A lapse in representation adversely affecting the defendant's interests can be demonstrated not only by what the attorney does, but by what he refrains from doing.") (citing *Holloway v. Arkansas*, 435 U.S. 475, 489–90 (1978). Addressing the court, Elmore denied that Scott was "attempting to hide and run" and stated that Scott hired him because of the underhanded tactics of the police, who were calling her repeatedly, "[t]hreatening to take her children, threatening to lock her up." N.T. 2/14/13 at 133-34. Because Elmore failed to identify the conflict of interest resulting from his dual representation and prepare for it ahead of trial, he jumped to protecting Scott's privilege during her testimony rather than allowing her to answer the prosecutor's questions. *See* N.T. 2/15/13 at 24 (Elmore stating that he "didn't know [he] was going to have [his] letter read" and "didn't know [the prosecutor] was going to make [him] a part of the case").[2] He erroneously believed that the

---

[2] The prosecutor maintained that Elmore was well aware of the conflict before trial and implied that he should have been prepared for the Commonwealth's line questioning. N.T. 2/15/13 at 25.

only option to explain the circumstances of his representation was to testify himself, but ultimately conceded that Scott could testify as well if he allowed her to waive privilege. N.T. 2/14/13 at 134-36. He then tried to re-call Scott to correct the impression left with the jury during her testimony, but by the time she returned to court it was too late and the court denied him the opportunity. N.T. 2/14/13 at 135-36; N.T. 2/15/13 at 88.

As for adverse effect, the consequences of Elmore's dual representation were obvious and devastating for Harvey, leading the prosecutor to essentially argue that Harvey, Scott, and Elmore conspired to frustrate the police investigation into Harvey's involvement in the case. N.T. 2/15/13 at 73-74. In *Taylor*, by contrast, the Third Circuit found that Taylor had failed to identify any cross-examination material or useful defense strategy forgone by trial counsel. 2024 WL 4449417 at *6. The court noted that Taylor's counsel "vigorously questioned the informant about his past convictions for crimes of dishonesty and called several witnesses to impeach his credibility" in addition to allowing the informant to waive attorney-client privilege in order to fully discuss their conversations regarding Taylor's case before the jury. *Id.* at *7. Those conversations involved an exchange where trial counsel attempted to dissuade the informant from testifying at Taylor's trial, albeit unsuccessfully and for unexplained reasons. *Id.* The court found that the "exchange *could* have, as Taylor argues, left jurors with the impression that Gutkin tried to silence a prosecution witness" but concluded that any potential impression was not caused by a conflict of interest, as trial counsel had waived the privilege over his

8

conversations with the informant and disputed his claim that counsel tried to discourage his testimony. *Id.* at *2, 7 (emphasis in original).[3]

The interaction between Elmore and Scott was materially different. Elmore, unlike Taylor's counsel, was completely unprepared for the possibility that the subject of his dual representation could come up and did not plan to waive Scott's attorney-client privilege so that she could answer questions about the circumstances of the representation. Although Scott had a reason for hiring Elmore that was unrelated to Harvey, she was unable to testify to that reason because of Elmore's conflict of interest. Accordingly, because Scott provided no testimony regarding the circumstances of her representation by Elmore, there was more than a *possibility* that the jury was left with the impression that Elmore had tried to silence Scott – it was all but certain as it was the only possibility presented to the jury. In closing,

---

[3] Judge Montgomery-Reeves concurred in *Taylor*'s result but expressed grave concern about counsel's ongoing dual representation of Taylor and a government informant that ended only seven days before trial. 2024 WL 4449417 at *8 (Montgomery-Reeves, J., concurring) ("I, like the PCRA court, am haunted by this case. I am haunted that the period when Gutkin 'actively represented conflicting interests' has gone unchallenged, and therefore unreviewed, by multiple counsel, in multiple proceedings, in multiple courts. I can only hope that such a scenario is never repeated.") Allowing that there may not have been any adverse effect from the apparently resolved conflict at trial, Judge Montgomery-Reeves asked, "[W]hat about any adverse effect of Gutkin's representation during the conflict? I am not aware of any binding authority that suggests that ending the dual representation negates any prior adverse effect such that a *Cuyler* claim is essentially mooted by ending the dual representation." *Id.* Harvey's case too raises serious questions about how Elmore's conflict affected his trial preparation and the police investigation itself. His representation of Scott, Hicks, and other "players" potentially involved in the case likely impacted his efforts to investigate the identity of the true perpetrator in the shooting and to obtain crucial evidence, like the Facebook photo. Taylor petitioned for rehearing *en banc* before the Third Circuit Court of Appeals on November 13, 2024, and that petition remains pending.

the prosecutor argued that Scott hired Elmore "to shield the man who did it" and that she was "obstructing justice." N.T. 2/15/13 at 73-74.

The PCRA court found it was clear that in attempting to protect Scott from police questioning, Elmore allowed the Commonwealth to create the impression that he was attempting to prevent a witness from testifying against his client, Harvey. 4/6/22 Opinion at 10. That impression resulted directly from Elmore's conflict of interest. The Commonwealth's assertion that the prosecutor's comments were "categorically not an aspect of trial counsel's performance," ECF No. 35 at 21, ignores that the comments would not have been possible if Elmore had not prevented testimony from Scott that would have rebutted the negative impression. Contrary to the Commonwealth's *current* arguments, the fact of Elmore's dual representation created the impression that Elmore had manipulated the police investigation. *See* ECF No. 35 at 21. The prosecutor at trial believed the dual representation was "absolutely probative," and argued that it was important for the jury to know that "the key witness in this case was represented by the same person who wasn't even identified as the shooter, wasn't even arrested as a shooter, and then once he is, now it's the same attorney." N.T. 2/14/13 at 30. Had Elmore properly withdrawn from representing Harvey at trial, that argument would not have been available to the Commonwealth. And if Elmore had breached his duty of loyalty to Scott by allowing her to waive privilege and answer the prosecutor's questions, the Commonwealth would not have been able to shape the narrative to Harvey's detriment.

10

### 3. Harvey can overcome procedural default of the aspect of the conflict claim relating to Elmore's representation of Terrence Hicks

To the extent that Elmore's prior representation of Terrence Hicks constitutes a separate conflict of interest claim, Harvey can overcome the claim's procedural default under *Martinez v. Ryan*, 566 U.S. 1 (2012). For the same reasons relating to the conflict claim regarding Elmore's representation of Scott, PCRA counsel was ineffective for failing to investigate and raise this aspect of Elmore's conflict of interest, especially considering that Elmore stated on the record that he "may represent several others in the matter." N.T. 11/16/10 at 3; *see* ECF No. 28 at 49.

Contrary to the Commonwealth's assertion, the portion of the claim alleging that Elmore labored under an actual conflict of interest due to his prior representation of Terrence Hicks has at least "some merit." *Workman v. Superintendent Albion SCI*, 915 F.3d 928, 941 (3d Cir. 2019). Although Elmore no longer represented Hicks at the time of Harvey's trial because he was deceased, his successive representation of Harvey and Hicks, the potential perpetrator of the crime Harvey was charged with, constituted an actual conflict of interest. *See Perillo v. Johnson*, 205 F.3d 775, 798 (5th Cir. 2000) (several circuits have recognized that successive, as opposed to concurrent, representation can result in an actual conflict of interest); ECF No. 28 at 43 n.10. Elmore's prior representation of Hicks "divided his loyalties" and potentially caused him to forego a viable alternative suspect defense. *Perillo*, 205 F.3d at 798; Elmore Declaration at ¶ 7. Although Elmore does not remember discussing Hicks's involvement in the shooting with Harvey, he was clearly

11

on notice that Hicks was involved in the shooting, since he asked Scott during her testimony whether he was present on the scene. N.T. 2/13/13 at 161-62.

Although Scott later learned that Hicks was involved in the shooting, she did not witness it herself, consistent with her testimony at trial. Accordingly, Elmore could not further question her about whether Hicks was involved beyond being present on the scene that day. Elmore could have investigated Hicks's involvement before trial, however, by interviewing witnesses on the scene or others in the neighborhood with knowledge of the shooting. But his prior representation of Hicks, as well as other "players" like Clifton Jones, likely impeded any independent investigation and prevented him from presenting evidence of Hicks's involvement at trial, causing obvious adverse effect. Accordingly, this aspect of the conflict of interest claim is meritorious such that Harvey can overcome any procedural default and is entitled to relief.

B.     **Trial Counsel Was Ineffective for Failing to Obtain and Utilize the Facebook Photo Used by the Complaining Witnesses Earlier in the Proceedings**

The Commonwealth argues that Harvey's claim alleging Elmore was ineffective for failing to obtain and utilize the Facebook photo is inexcusably procedurally defaulted because it is not substantial. ECF No. 35 at 27. Its argument largely rests on the irrational assertion that Photo D-7 is not the Facebook photo identified by the complaining witnesses despite the many detailed similarities between D-7 and the photo the witnesses described. Darnell Thomas testified, "He's in a picture with three girls; Sky and two girls I don't know. He's kneeling on the ground with a hat on. It's the same hat he had on when he shot

12

me. I'm 150 percent sure it's him." N.T. 2/12/13 at 115.[4] When comparing that description with Photo D-7, *see* ECF No. 35 at 25, it is unreasonable to argue they are not the same photo. The Commonwealth does not contest that one of the women in the photo is Shakeema Scott, who Wright and Thomas would have recognized, and that the man depicted in the photo is not Harvey, despite the witnesses being positive the man was the person who shot them. ECF No. 35 at 24. The photo shows three women, one of whom is Scott, two of whom Thomas presumably did not know, and a man kneeling on the ground wearing a hat, matching Thomas's description perfectly. It would be an enormous coincidence if the photo Elmore admitted as D-7 happened to be a second photo of Scott with two women and a man kneeling on the ground distinct from the one that Wright and Thomas identified on her Facebook page, which supposedly featured Harvey.

The Commonwealth asserts that is likely that Elmore obtained the photo, not from Scott and her siblings, but from the Commonwealth sometime before trial. ECF No. 35 at 34 n.14. At trial, Elmore asserted that he got the photo, along with other Facebook photos, from the Commonwealth, while the prosecutor believed that she got the photos from Elmore since they were not included in the detective's file. N.T. 2/15/13 at 6-13. At sentencing, Elmore stated that he did not get the photos from Scott, but from the Commonwealth "in the course of trial." N.T. 4/24/13 at 13. The prosecutor at sentencing,

---

[4] Detective Murray claimed that there was only one person depicted in the picture until he was confronted with Thomas's statement describing a man and three women. N.T. 2/14/13 at 90.

13

who handled the case before the trial prosecutor, recalled showing Elmore "all these pictures" but it was unclear whether those pictures included the one brought in by the complaining witnesses or Photo D-7. N.T. 4/24/13 at 25. In any event, Elmore either did not have or did not realize he had the Facebook photo in his possession until trial was underway, which caused him to forgo showing it to the witnesses on the stand. Regardless of where Elmore got the photo, whether it was from the Commonwealth or from Scott, he ineffectively failed to utilize Photo D-7 to establish that Harvey was not the person Thomas and Wright initially identified as the shooter.[5]

Even without considering Elmore's and Scott's declarations, this Court can conclude from the trial record that Elmore had no strategic reason for failing to show the photo to Scott, Thomas, and Wright. Elmore repeatedly emphasized the importance of having the photo, which was central to the defense strategy, and questioned both complaining witnesses about it, even suggesting in his line of questioning that the man in the photo was Scott's brother, not Harvey. N.T. 2/11/13 at 69; N.T. 2/13/13 at 122. Elmore requested production of the photo identified by the complaining witnesses throughout trial, from Thomas, Wright, and Murray, who all ultimately reported that they no longer had the photo. N.T. 2/12/13 at 93; N.T. 2/13/13 at 118-19; N.T. 2/14/13 at 40-42; N.T. 2/15/13 at

---

[5] Elmore recently stated that he did not obtain the photo earlier because he was not familiar with Facebook. ECF No. 28-2 at ¶ 10. Throughout the trial proceedings, Elmore repeatedly expressed confusion with Facebook and how he could access photos posted by a Facebook user. *See e.g.*, N.T. 4/24/13 at 12 ("I'm not a cyber person. I don't know what a Facebook page is. I don't have one.").

37-38. Elmore would not have persisted in trying to acquire the Facebook photo obtained by the witnesses and provided to the police if he believed it could incriminate Harvey. Further, Elmore tried in vain to get Scott to retake the stand to ask her about the Photo D-7 because "[s]he knows the Facebook picture," but he was unable to do so, which prevented the photo from being authenticated and provided to the jury. N.T. 2/14/13 at 135-36; N.T. 2/15/13 at 142-43.

Even if Thomas and Wright had been shown Exhibit D-7 and denied that it was the Facebook photo they identified, there is a reasonable probability that the jury would not have credited those claims given the similarities between D-7 and Thomas's description of the Facebook photo. Thomas and Wright's identifications were not reliable or credible, as discussed in Harvey's memorandum of law. *See* ECF No. 28 at 53-55; ECF No. 35 at 26 n.15 (Commonwealth acknowledging that Thomas was unable to validate his identification of Harvey's co-defendant at trial). Further, even if Elmore would have hesitated to show Photo D-7 to Thomas and Wright, there was no downside to showing the photo to Scott when she was on the stand to authenticate it and publish it to the jury. The jury wanted to see Photo D-7, despite Murray's uncredible denial that D-7 was the Facebook photo he failed to maintain. Had the jury been able to see the photo and match similarities between it and Thomas's detailed description, there is a reasonable probability it would have concluded that D-7 was in fact the Facebook photo and that the man who Thomas and Wright were so sure was the perpetrator immediately after the shooting was not Harvey – regardless of whether it was shown to the complaining witnesses or not.

15

Accordingly, Harvey's ineffective assistance of counsel claim has substantial merit such that any procedural default is excused under *Martinez* and relief is warranted.

**C.    The Commonwealth Violated *Brady v. Maryland* When It Failed to Disclose Evidence of Misconduct for Detective Joseph Murray**

First, even if the procedural default of Harvey's *Brady* claim cannot be excused under *Banks v. Dretke*, 540 U.S. 668 (2004), he can demonstrate cause and prejudice to excuse the default. "'[C]ause' under the cause and prejudice test must be something *external* to the petitioner, something that cannot fairly be attributed to him . . ." *Coleman v. Thompson*, 501 U.S. 722, 753 (1991) (emphasis in original). Ordinary negligence on the part of a petitioner's state postconviction attorney generally does not qualify. *Id.* However, the Supreme Court has recognized that "more serious instances of attorney misconduct" amounting to more than "garden variety" negligence or "excusable neglect" can constitute extraordinary circumstances warranting an equitable remedy. *Holland v. Florida*, 560 U.S. 631, 652 (2010). When an attorney abandons his client and causes procedural default, "[h]aving severed the principal-agent relationship, an attorney no longer acts, or fails to act, as the client's representative." *Maples v. Thomas*, 565 U.S. 266, 281 (2012) (finding cause to excuse procedural default where attorney abandonment of petitioner qualified as extraordinary circumstances).

Although Harvey's post-conviction counsel, George Newman, did not literally abandon Harvey by ceasing to communicate with him or work on his case, he constructively abandoned him by failing to inform him that he possessed new evidence undermining the credibility of the lead detective in his case. *See Gibbs v. Legrand*, 767

F.3d 879, 885 (9th Cir. 2014) ("An attorney's failure to communicate about a key development in his client's case can . . . amount to attorney abandonment and thereby constitute an extraordinary circumstance."). According to Harvey, Newman told him that he had received a *Brady-Giglio* Disclosure (BGD) regarding Detective Murray's misconduct from 2018,[6] but never informed him that Murray also had documented misconduct from 2004, before Harvey's prosecution and trial took place. He never sent Harvey a copy of the BGD packet he received, so Harvey was unable to review the misconduct for himself to determine whether a *Brady* claim was available to him while his successor PCRA petition was pending. Harvey did not learn about the 2004 misconduct until undersigned counsel recently obtained the BGD from the Commonwealth and then confirmed that Newman possessed substantially the same packet in his own case file.

Because he never knew about the misconduct and was effectively told it did not exist, Harvey was unable to make an informed decision about whether it was possible to raise a timely *Brady* claim in state court. Newman's misrepresentation thus amounted to a severance of the principal-agent relationship and effective abandonment. *See United States v. Martin*, 408 F.3d 1089, 1096 (8th Cir. 2005) (finding extraordinary circumstances warranting equitable tolling where prior counsel "misrepresented the law, misrepresented the status of Martin's case, and retained possession of documents that were crucial to Martin's claim" and Martin reasonably relied on those representations). Accordingly,

---

[6] The 2018 misconduct post-dated Harvey's case becoming final on direct review and likely could not have served as a basis for a meritorious *Brady* claim.

Newman's serious misconduct qualifies as cause to excuse the procedural default of the *Brady* claim, and Harvey can demonstrate prejudice as the suppressed evidence was material to his case.

Contrary to the Commonwealth's argument, the evidence of Detective Murray's misconduct absolutely put the case in a different light and undermined confidence in the verdict at trial. *See* ECF No. 35 at 32. The Commonwealth claims that the complaining witnesses' identifications were sufficient to convict Harvey apart from Detective Murray's testimony, but the reliability of those identifications depended on whether they had previously identified Harvey from the Facebook photo they found and presented to Murray. *See Strickler v. Greene*, 527 U.S. 263, 290 (1999) ("[T]he materiality inquiry is not just a matter of determining whether, after discounting the inculpatory evidence in light of the undisclosed evidence, the remaining evidence is sufficient to support the jury's conclusions."). Both witnesses told police that they were either "150 percent sure" or "a thousand percent sure" that the man in the photo was the shooter. N.T. 2/12/13 at 94-95, 115; N.T. 2/13/13 at 119. Darnell Thomas further bolstered his identification of Harvey by relying on his identification of the shooter from the Facebook photo. N.T. 2/12/13 at 102 ("They didn't show me photos of your client. I found your client.").

Despite both witnesses insisting that they had provided the photo to Murray in some form, Murray uncredibly claimed that he did not think it was important to preserve the photo, and then claimed that Photo D-7, which precisely matched the details provided by the witnesses, was not the photo in question. N.T. 2/14/13 at 66, 91-92. Elmore's theory at

18

trial was that Murray purposely failed to maintain the photo because it did not depict Harvey and would jeopardize the later identifications of Harvey the witnesses made from the photo arrays. N.T. 2/15/13 at 59. Had the jury heard that Murray had a history of lying about evidence – and that the District Attorney's Office had withdrawn prosecution in several cases involving Murray, ECF 28-8 at 21, but allowed him to testify at Harvey's trial – there is more than a reasonable probability it would have doubted his testimony regarding the photo and concluded that Photo D-7 was in fact the Facebook photo. Further, Murray's history of pressuring a witness to change her account to match his would have informed the jury's assessment of the identification of Harvey from the photo array. *See* ECF No. 28-8 at 4. Throughout trial, the Commonwealth and Murray insisted that the Facebook photo was of no moment because the witnesses later identified Harvey from a police-prepared photo array, but Detective Murray's prior misconduct seriously calls the reliability of that identification procedure into question.

Murray's already questionable testimony regarding the photo, compounded by the evidence of his previous misconduct, would have further caused the jury to question the veracity of his claim that he called Shakeema Scott and she identified Harvey as the shooter. Murray's claim that he called Scott, when Scott denied that any such call took place, is remarkably similar to the 2004 misconduct detailed in the BGD. Murray falsely testified that an informant made a call to a drug dealer using his phone, but phone records demonstrated that no such call was ever made. ECF No. 28-8 at 7-8. The fact that Elmore's letter referred to Scott not wanting to make "anymore" statements is not probative. *See*

ECF No. 35 at 32. Elmore could have been referring to Scott's interaction with any police officer following the incident or to her interactions with the complainants and their wives, who contacted her afterward to find out what she knew. N.T. 2/13/13 at 147. Elmore's letter never referenced a specific statement made to Detective Murray.

Murray's credibility was far from "tangential" to Harvey's case. *See* ECF No. 35 at 32. By failing to maintain the Facebook photo and incredibly claiming that Photo D-7 was not the photo in question, he shielded the Commonwealth from any defense attacks on the reliability of the witness identifications of Mr. Harvey. And by offering testimony that Scott, the mother of Harvey's children, identified him as the shooter on the night of the incident, he provided powerful corroborating evidence to bolster an otherwise weak eyewitness identification case. Had the jury known that he had a history of pressuring witnesses and testifying falsely, there is a reasonable probability it would have credited Scott's testimony over his and rejected the witness identifications of Harvey as unreliable. Accordingly, the suppressed evidence is material such that Harvey can overcome procedural default of the *Brady* claim and is entitled to relief.

**D.      Conclusion**

For the reasons above and those outlined in his opening brief, Harvey respectfully requests that this Court grant habeas relief, and to the extent necessary, an evidentiary hearing.

Respectfully submitted,


/s/ *Claudia Flores*
CLAUDIA FLORES
Supervising Attorney, Non-Capital Habeas Unit
Federal Community Defender Office for the
Eastern District of Pennsylvania
601 Walnut Street
The Curtis Center, Suite 540 West
Philadelphia, PA 19106
(215) 928-1100

*Counsel for Petitioner, William Harvey*

Date: February 24, 2025

21

**CERTIFICATE OF SERVICE**

I, Claudia Flores, hereby certify that on this date this document has been filed electronically and is available for viewing and downloading from the Court's ECF system. I have served this document electronically upon Andrew Metzger, Assistant District Attorney, Philadelphia District Attorney's Office.

/s/ *Claudia Flores*
CLAUDIA FLORES

February 24, 2025